The judgment must be reversed, and the demurrer overruled, with costs in this court and at Special Term, and with leave to the respondent to withdraw the demurrer and serve an answer within 20 days on payment of such costs. All concur.

## AUBREY v. HUDSON VALLEY RY. CO.

(Supreme Court, Appellate Division, Third Department. June 29, 1910.)

1. MASTER AND SERVANT (§ 276*)—INJURIES TO SERVANT—CAUSE OF ACCIDENT —EVIDENCE.

In an action against a street railroad for death of a conductor, evidence held to show that the absence of sand on the car had nothing to do with the accident.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–954, 959, 970, 976; Dec. Dig. § 276.*]

2. MASTER AND SERVANT (§ 97*)—INJURIES TO SERVANT—NEGLIGENCE.

In an action against a street railroad for death of a conductor in a collision, defendant was not chargeable with negligence in not anticipating the formation of a fog of unusual density at a certain point some miles from the place of departure, though it had knowledge of the general atmospheric conditions at such place.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 163; Dec. Dig. § 97.*]

3. MASTER AND SERVANT (§ 265*)—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.

In an action against a street railroad for death of a conductor, in a collision, the burden of establishing decedent's freedom from contributory negligence was on plaintiff.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 908; Dec. Dig. § 265.*]

4. MASTER AND SERVANT (§ 281*)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE—SUFFICIENCY OF EVIDENCE.

In an action against a street railroad for death of a conductor in a collision, evidence held insufficient to sustain a finding that deceased was free from contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 987–996; Dec. Dig. § 281.*]

Appeal from Trial Term, Washington County.

Action by Virginia Aubrey, as administratrix of Edgar E. Aubrey, deceased, against the Hudson Valley Railway Company. From a judgment for plaintiff, and from an order denying a motion to set aside the verdict, defendant appeals. Reversed, and new trial granted.

About 6 o'clock in the morning of September 23, 1908, a trolley passenger car of the defendant in charge of plaintiff's decedent, Edgar E. Aubrey, as conductor, left Glens Falls for Ft. Edward and Thompson. At Ft. Edward the conductor and motorman received orders by telephone from the dispatcher at Stillwater that for the remaining distance to Thompson they were to follow another passenger car bound for Troy. The two cars left Ft. Edward at an interval of not more than a minute or a minute and a half. After leaving Ft. Edward, a heavy fog settled down over the track. At Ft. Miller, seven miles from Ft. Edward, the Troy car was standing at a street crossing discharging passengers when the car in charge of Aubrey plunged into it with such violence as to drive the Troy car forward, although its brakes were

partly set, for a distance varying from 175 to 250 feet according to the estimates of the different witnesses. The forward vestibule of Aubrey's car by the force of the collision was driven forward about 10 feet into the rear of the Troy car. Aubrey was standing at the time either in the front vestibule or in the door leading therefrom into the car and was killed. Plaintiff has recovered a verdict because of the negligence of the defendant in causing the death of Aubrey, and from such judgment the defendant appeals.

Argued before SMITH, P. J., and KELLOGG, COCHRANE, SEWELL, and HOUGHTON, JJ.

Lewis E. Carr and James McPhillips, for appellant.
Erskine C. Rogers and John E. Sawyer, for respondent.

COCHRANE, J. The jury was permitted to find negligence on the part of the defendant because it had not equipped the rear car with a sand box. The motorman of that car was called as a witness by the plaintiff. He testified as to his futile efforts to stop the car as soon as he perceived in the fog the car ahead of him. He says he applied the hand brake, and also the air brake, and reversed the power, but without avail. He further testified:

"I did not use the sand; the only chance I had was the air. I did not look to see if there was any sand there; I did not see any. I did not seem to see any sand box on that car. As a rule they are equipped, but I cannot tell you whether there was sand there or not. I will not swear that this car had a sand box on it. Generally cars have them. The purpose of sand is in case of a slippery rail, or after a little rain or something like that, when your rail gets moist, to aid the brakes in holding the car."

Subsequently he was asked by plaintiff's counsel:

"If you had time to do what you have described, why had you not time, if it had been there, to have touched your foot to a little pedal and opened the sand box and let sand down to the rail?"

To which question he made answer:

"I did not have time to do anything only throw the brakes, as I have told you."

It is clear from his testimony that the absence of sand had nothing to do with the accident. The motorman did not attempt to use it, and did not know whether it was there or not, and would not have used it had it been there. The purport of his testimony is that the accident was so sudden and unexpected that he had neither the time nor the opportunity to make use of sand. The negligence, if any, of the defendant, therefore, in not furnishing sand, had nothing to do with the accident, and it was error to permit the jury to predicate their verdict on such ground of negligence.

The jury was further permitted to find negligence against the defendant because the motorman of the rear car was not familiar with this particular portion of the defendant's road. He had previously operated a freight car over this locality in the night, but claims not to have been familiar with the usual stopping places, and it is contended that the defendant was chargeable with knowledge of the foggy condition of the weather and should not on that account have intrusted the operation of this car to this motorman. The great preponderance of evidence is that the atmosphere was clear when the car

left Glens Falls. There is no evidence whatever as to the condition at Stillwater, from which place this train crew received orders to follow the Troy car from Ft. Edward. The motorman himself testifies that the fog did not begin to settle until after he left the latter place, and that at a point only three or four miles from the collision he saw the car ahead of him at a distance which he estimates to be 800 or 900 feet. He says the fog then began to settle rapidly. Assuming, however, that the defendant was chargeable with knowledge of the weather conditions, it was not negligent in intrusting to this motorman the operation of the car. There is no claim that he was an inexperienced or incompetent man. He knew the Troy car was preceding him with a headway of only 1½ minutes, as he himself testifies. While he may not have known as well as some others the exact location of Ft. Miller, he must have known in a general way that it was not far distant, and he certainly knew that he was following a passenger car which was liable to stop for the accommodation of passengers. If the fog was as dense as claimed, no motorman, however familiar with the locality, could have had much more knowledge than himself of his exact whereabouts with reference to the particular stopping places along the road. The defendant could not reasonably be charged with negligence for not anticipating that a fog of unusual density would form at Ft. Miller when the car was within three or four miles of that place, even if it had knowledge of the general atmospheric conditions when the car left Glens Falls. Certainly it can hardly be claimed that the defendant would have been negligent in sending out this motorman with a car at night, and no difference existed which made it any more negligent to do so in the daytime, although a fog existed. Moreover, a rule of the defendant expressly made it incumbent on the conductor to know that the motorman was familiar with his duties. The rule is as follows:

"They (passenger conductors) must know that the men employed on their trains are familiar with their duties."

It was further made his duty to have personal familiarity with the localities along the road so that he might "distinctly announce the names of streets, stop stations, transfer points, when approaching same." Consequently, if the motorman was not sufficiently familiar with the stop stations, it was the duty of the conductor to be aware of that fact and to supplement such unfamiliarity with his own knowledge.

I am also of the opinion that plaintiff failed to establish freedom from negligence on the part of the decedent. The burden rested on her to establish that feature of the case. A determination of the question as to whether or not she has successfully borne that burden must be made with reference to the rules of the defendant which governed the conduct of the deceased and his duties and responsibilities as conductor of the car. As such conductor, under the rules of the defendant, he was made "responsible for the movement, safety and care of the train and for the vigilance and conduct of the men employed thereon." Another rule provided that:

"Trains in the same direction must keep at least two minutes apart."

There was a distinct violation of this latter rule by the deceased in permitting his car to leave Ft. Edward as the uncontradicted evidence shows within a minute or a minute and a half after the Troy car left that place. It does not, of course, necessarily follow that the violation of this rule at Ft. Edward caused the accident at Ft. Miller seven miles away. But the Troy car was proceeding on schedule time. The rear car was an extra. At a place known as "Black House," about 3 miles from the accident, the intervening space between the cars, as estimated by the motorman, was only about 800 feet. At Patterson, about 2 miles from the accident, the rear car stopped to let off a passenger. The deceased, of course, was chargeable with knowledge of the schedule time of the Troy car. There is no contention that at the time of the collision at Ft. Miller it was behind its schedule time.

Under the circumstances here appearing, bearing in mind that the conductor had in his charge the actual movement and operation of his car not only with reference to his own safety but also with reference to the safety of his passengers, it does not sufficiently appear that he was exercising the caution required by the exigencies of the situation. He negligently permitted his car to leave Ft. Edward in too close proximity to the preceding car, knowing that the latter car was proceeding on a prepared schedule and was making stops for the accommodation of passengers, and he apparently made no effort to keep at a sufficiently safe distance therefrom. When the fog settled more densely, and the danger was thereby increased, his responsibility also increased in proportion to the increasing danger. As stated, it was his duty, according to the rules of his employment, to know whether his motorman was familiar with the location of the stop stations. As a competent conductor in the performance of his duty to the defendant, he was bound to know that he was approaching Ft. Miller, where the Troy car on a fixed schedule might at that moment be discharging passengers; that his motorman was not familiar with the location; that there was danger of a collision because of the difficulty of seeing objects in the fog, and with knowledge of all these facts he had the power to see that the car was operated in such a way as not to meet with disaster, and he owed the duty of active vigilance in that respect. So far as the evidence discloses, he took no precautions whatever. He was standing directly behind the motorman. According to the testimony of the latter, no word of warning or caution was given either as to the speed of the car or otherwise. Moreover, the deceased was not at his post of duty at the time of the collision. The rules distinctly required him to be on the rear platform when not collecting fares or otherwise engaged and to keep his hand "upon the trolley rope when passing over switches, crossings or going through curves." The collision occurred directly on a crossing which was also an important stop station. While the fog may have excused him from knowing that he was exactly at that crossing, he must have known that he was closely approaching it, because he had stopped at Patterson, only two miles distant. The motorman positively disclaims any communication with him after leaving Patterson, so that it is very clear that there was no occasion which required him to be absent from the rear platform, where, in obedience to his instruc-

·tions, he should have been. The evidence is therefore insufficient to sustain the determination of the jury that the deceased · was exercising due care.

The judgment and order must be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.